# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| | |
|---|---|
| JAMES B. MCGREW, | : Case No. 3:16-cv-220 |
| Plaintiff, | : |
| vs. | : Magistrate Judge Sharon L. Ovington |
| | : (by full consent of the parties) |
| NANCY A. BERRYHILL, | : |
| COMMISSIONER OF THE SOCIAL | : |
| SECURITY ADMINISTRATION, | : |
| Defendant. | : |

# DECISION AND ENTRY

## I.  Introduction

Plaintiff James B. McGrew—a veteran of the United States Army—applied for Disability Insurance Benefits on September 29, 2009. He asserted that he could no longer work a substantial paid job due to post-traumatic stress disorder (PTSD), depression, degenerative disc disease, facet arthropathy, and bulging discs.

Plaintiff's application and evidence went through two rounds of administrative proceedings with the Social Security Administration. The first effectively ended in February 2012 when Administrative Law Judge (ALJ) Mary F. Withum concluded that he was not under a disability and not eligible for benefits. Plaintiff brought a previous case in this Court successfully challenging ALJ Withum's decision, resulting in a remand for administrative proceedings. *See McGrew v. Commissioner of Social Security*, 3:13-

cv-118, 2014 WL 1382540, at *9 (S.D. Ohio 2014) (Ovington, M.J.), *Report & Recommendation adopted*, 2014 WL 1671497 (S.D. Ohio April 28, 2014) (Rose, D.J.).

On remand, another ALJ, Elizabeth A. Motta, was assigned to Plaintiff's case. Upon her review, she concluded that Plaintiff was not under a disability and not eligible for benefits. Plaintiff brings the present case challenging ALJ Motta's decision. He contends that the ALJ essentially separated his impairments and evaluated each in isolation rather than determining the combined impact of his physical and mental limitations. This approach was flawed, Plaintiff reasons, because it failed to incorporate all his functional limitations when evaluating the most he can do despite his impairments. He further maintains that the ALJ erred in weighing the treating and non-treating medical sources' opinions.

The Commissioner maintains that substantial evidence supports the ALJ's evaluation of the opinion evidence and the ALJ's review of the Veterans Administration's decision to assign Plaintiff a 100% disability rating.[1]

## II. Background

Plaintiff served in the United States Army from July 1992 to December 1999, including a four-month tour in Somalia. He was last employed by the United States Postal Service. He asserts that he has been under a benefits-qualifying disability starting on April 21, 2008. He was thirty-eight years old at that time and was therefore

---

[1] The ALJ recognized that the record contains a letter acknowledging Plaintiff has a 100% disability rating from the VA (Doc. #6, *PageID* #s 1046, 966). Yet, the Commissioner notes, "it appears Plaintiff never received a 100% disability determination from the VA." (Doc. #10, *PageID* #1613). The Commissioner instead points to records showing Plaintiff had a 60% disability rating. *Id*. (citing *PageID* #s 395-403, 1287, 1305, 1322, 1366).

2

considered a younger person under social security law. 20 C.F.R. § 404.1563(c). He graduated from high school and completed two years of college.

   A.   **Plaintiff's Testimony**

Plaintiff testified at the hearing before ALJ Motta that he is unable to work because of daily pain in his lower back. (Doc. #6, *PageID* #1069, 1075). The only position that helps alleviate his pain is lying flat on the floor. *Id.* at 1076. Plaintiff's treatment has included prescription medication and injections. *Id.* at 1069. The injections helped with his pain and, he noted, are "supposed to last up to eight years." *Id.*

Between 2008 and 2012, Plaintiff saw his chiropractor, Dr. Ewing, three times a week. *Id.* at 1077. When Plaintiff's back pain "flared up" or when there was spinal cord swelling, he was not always able to get full treatments. *Id.* On those days, Dr. Ewing could only put ice on his back. *Id.* Plaintiff was told that he is "not a surgical candidate." *Id.* at 1069.

Plaintiff struggles with PTSD and depression. *Id.* at 1072. Dr. Sehbi, a psychiatrist at the Veterans Center, prescribes medication. *Id.* at 1071. Although the medicine helps, he still gets angry, anxious, and depressed: "it's just a little more under control now." *Id.* at 1079. He also attends therapy with Dave Roby. *Id.* at 1070. At the time of the hearing, Plaintiff had been seeing Mr. Roby twice a week for three years. *Id.* at 1070-71. Before Mr. Roby, Plaintiff saw Greg Meriwether for therapy. *Id.* at 1071. At some point between 2008 and 2012, Plaintiff also saw Frances Ingram at the Veterans Center for high-risk suicide prevention. *Id.* at 1077-78. At the time, he had suicidal thoughts every day. *Id.* at 1078. After seeking help at the Veterans Center and taking

3

medication—Sertraline—he improved enough to be removed from the high-risk suicide prevention list. *Id*.

Plaintiff lives in a house with his four children—ages 23, 21, 17, and 10. *Id.* at 1065. He has a driver's license and drives about twice a week. *Id.* at 1066. He sometimes gets up at 6:00 a.m. and other times gets up at noon. *Id.* at 1076. It all depends on how his back feels. *Id.* at 1076. He usually goes to bed between 8:00 p.m. and 10:00 p.m. *Id*. Of the twelve to fourteen hours he is awake, he spends eight to nine hours lying down. *Id*. He estimated that he can stand for thirty minutes or less before he "gets uncomfortable." *Id.* at 1079.

Plaintiff does not do any chores—his sons do them. *Id.* at 1072. He microwaves food from time to time. He is able to shower and dress himself; he does not use a computer because he cannot sit for long enough; he only uses his phone, and he generally lies down while he uses it. *Id*. If his sons cannot go to the store, he will go but "make[s] it quick." *Id.* at 1073. He prefers not to because he does not like crowds and it affects his back. *Id*. He only attends church when he "feel[s] good." *Id*. He "sometimes" attends his children's school activities. *Id.* at 1075.

### B. Medical Opinions

#### i. Joseph T. Ewing, D.C.

Dr. Ewing, Plaintiff's chiropractor since April 2006, wrote several opinions concerning his back injury. On September 8, 2009, Dr. Ewing indicated Plaintiff's diagnoses include extensive lumbar disc degeneration, bilateral posterior facet arthropathy, multiple disc bulges, and spondylosis of the lumbar spine. *Id.* at 868. Dr.

4

Ewing opined, "his condition has not responded well to the multidisciplinary treatment regimen consisting of medication, physical therapy, joint manipulation, and epidural injections." *Id.* Further, Plaintiff "is not a candidate for surgical intervention because of the absence of a well defined surgical lesion." *Id.* "Recent examination reveals continued loss of lumbar range of motion, aberrant spinal motion, palpable myospasms, tenderness, and trigger points." *Id.*

Although Plaintiff's condition is stable, it is not improving and, "It is likely that his condition will slowly deteriorate over time as the degenerative findings present on his imaging studies are progressive in nature." *Id.* Dr. Ewing concluded, "He is unable to engage in any type of sustained remunerative employment as a result of the instability and loss of functional ability in his lumbar spine. To do so would place him or others around him at significant risk of injury. It is the belief of this physician that the patient's condition is now permanent and he will never work as a letter carrier for the United States Postal Service." *Id.*

### ii.  Simran K. Sehbi, M.D.

In January 2009, Dr. Sehbi, Plaintiff's psychiatrist, completed a Compensation and Pension Examination. (Doc. #5, *PageID* #580). Plaintiff reported that since he returned from Somalia he's had intrusive thoughts about his traumatic combat experiences and other incidents of death. *Id.* at 581. He identified the most traumatic experience in Somalia:

> The worst was after a blackhawk [helicopter] was shot down and once the battle was done [a] few of [t]he [Army] rangers, who had been captured and killed, were dragged through the

> city. [McGrew] was on ground duty when the dead rangers were brought back with body parts severed and missing. [McGrew], and some of his fellow soldiers, w[ere] ordered to reclaim one of the dead American soldier's body from one truck and load it onto another truck. The body was nude and his private parts had been mutilated.

*Id.* at 584. Plaintiff also discussed another traumatic event in which he witnessed a little Somalian girl get accidentally run over and killed by the trailer of an Army truck. He stated he saw "her head was smashed like a tomato and blood splattered everywhere." *Id.* He told Dr. Sehbi that "his experiences in Somalia have 'affected every aspect of my life.'" *Id.* at 583.

Plaintiff reported that he avoids contact "with people in general and mostly stays at home. He states his concentration is not good and his short term memory is less than desirable. He tends to forget what he was talking about." *Id.* at 582. Over the past two to three years his depression has worsened, along with a decrease in energy and low motivation. He does not want to leave his house. *Id.* Periods of anxiety and agitation also bother him, and he gets restless to the extent that he sometimes felt "dizzy." *Id*. During the two years before the ALJ's hearing, Plaintiff started having panic attacks. *Id*.

He did not seek treatment for his psychological issues for some time because he believed he was "strong." *Id.* at 583. He eventually sought treatment because he recognized it was getting worse and was afraid he would lose his family. *Id.* His wife— of twenty years—stated that his personality had changed since his time in Somalia. *Id.* at 585. She noted that his inability to work was hard on him as he had always been very

6

active. *Id.* She also noted that his symptoms were worsening, and he could not handle any stress. *Id.*

Dr. Sehbi observed that Plaintiff was somewhat anxious with some psychomotor agitation. *Id.* at 586. His affect showed an increase in intensity and reduction in rage; his mood was dysphoric and anxious; he had intrusive thoughts. *Id.* Dr. Sehbi diagnosed PTSD, chronic; depressive disorder NOS; alcohol abuse, by history, and cannabis abuse, in remission. *Id.*

Dr. Sehbi completed a mental impairment questionnaire on October 28, 2011. *Id.* at 865-67. She noted that Plaintiff's signs and symptoms included hypervigilance; hyperarousal; anger outbursts; personality change; decreased energy; panic attacks; pervasive loss of interests; nightmares; intrusive recollections of a traumatic experience; persistent irrational fears; paranoia or inappropriate suspiciousness; feelings of guilt/worthlessness; difficulty thinking or concentration, poor memory; generalized persistence anxiety; hostility and irritability; suicidal ideation; and emotional liability. *Id.* at 865-866.

Dr. Sehbi indicated Plaintiff's treatment includes medication and supportive therapy/counseling. *Id.* at 866. She opined, "Symptoms can easily [increase] with stress [and] when he encounters triggers (certain smells, certain type[s] of people …, certain TV programs ….). They bring back traumatic memories of combat in Somalia." *Id.* He has slight restrictions of activities of daily living; marked difficulties in maintaining social functioning; and extreme deficiencies in concentration, persistence, or pace. *Id.* at

7

867. Plaintiff's impairments or treatment would cause him to absent from work more than three times a month. *Id*.

### iii. Jerry E. Flexman, Ph.D.

Dr. Flexman evaluated Plaintiff on March 23, 2010. *Id.* at 636. He diagnosed pain disorder, intermittent explosive disorder, post-traumatic stress disorder, and alcohol abuse in partial remission. *Id.* at 639. He opined that Plaintiff's ability to understand, remember, and carry out short, simple instructions and his inability to make judgments for simple work-related decisions are mildly impaired. *Id*. Plaintiff has mild difficulties with sustained attention and concentration. *Id*. His restrictions for interacting appropriately with the public are marked. *Id.* at 640. His restrictions for interacting with supervisors and coworkers are moderate. Based on his current emotional state, his restrictions for responding appropriately to work pressures in a normal work setting are moderate, and his ability to respond to changes in the work environment is moderate, according to Dr. Flexman. *Id*.

## III. **Standard of Review**

Plaintiff's eligibility for Disability Insurance Benefits turned on whether he was under a "disability" as the Social Security Act narrowly defines it. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see* 42 U.S.C. § 423(a)(1)(E). An individual's health problems constitute social-security-eligible disabilities only when their physical or mental impairments are of such severity that they (1) cannot do their previous work, and (2) cannot, "considering their age, education, and work experience,

engage in any other kind of substantial gainful work which exists in the national economy ….." 42 U.S.C. § 423(d)(2)(A).

As indicated previously, it fell to ALJ Motta to evaluate the evidence and determine whether Plaintiff was under a disability. She did so by considering each of the five well-known sequential steps described by the regulations. *See* 20 C.F.R. § 404.1520(a)(4); *see also Rabbers*, 582 F.3d at 652.

As noted previously, it fell to ALJ Motta to evaluate the evidence connected to Plaintiff's application for benefits. She did so by considering each of the five sequential steps set forth in the Social Security Regulations. She reached the following main findings:

    Step 1:    Plaintiff has not engaged in substantial gainful employment since April 21, 2008, through his date last insured of September 30, 2012.

    Step 2:    He has the severe impairments of lumbar degenerative disc disease, post-traumatic stress disorder, and a depressive disorder.

    Step 3:    He does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

    Step 4:    His residual functional capacity, or the most he could do despite his impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of "light work … including lifting up to 20 pounds occasionally and 10 pounds frequently, subject to the following additional limitations: occasional postural activity, such as stooping, balancing, kneeling, crawling, crouching, twisting side-to-side, and climbing ramps and stairs; no climbing of ladders, ropes, or scaffolds; no exposure to hazards, such as dangerous machinery or unprotected heights; simple, repetitive tasks that are considered low stress, which is defined as work that does not involve strict production quotas or fast pace and which is routine … with few changes in the work setting; no contact with the public as part of job duties[;] and

9

only occasional contact with coworkers and supervisors, including no teamwork."

Step 4: He is unable to perform any of his past relevant work.

Step 5: He could perform a significant number of jobs that exist in the national economy.

(Doc. #6, *PageID* #s 1030-49). These main findings led the ALJ to ultimately conclude, as noted above, that Plaintiff was not under a benefits-qualifying disability. *Id.* at 1048.

## IV. Discussion

Plaintiff contends that the ALJ erred (1) when reviewing the opinions of Dr. Ewing, Dr. Flexman, and Dr. Sehbi; and (2) by picking and choosing only the evidence that supports her decision, including information from Mr. Roby's treatment notes. The Commissioner maintains that substantial evidence supports the ALJ's evaluation of the opinion evidence.

### A. Dr. Ewing's Opinions

Plaintiff contends that the ALJ erred by failing to properly evaluate the opinions of his treating chiropractor, Dr. Ewing. This error was not harmless, according to Plaintiff, because the applicable regulatory factors weigh in favor of placing substantial weight on Dr. Ewing's well-supported opinions.

ALJ Motta recognized, "Dr. Ewing, a chiropractor, opined that the claimant was unable to engage in any substantial remunerative employment as a result of instability and loss of functional ability in his lumbar spine." (Doc. #6, *PageID* #1044). The ALJ decided to place "minimal, if any, weight" on this opinion for several reasons. First, the ALJ explained that Dr. Ewing is a chiropractor "and not an acceptable medical source

10

who opinion may be entitled to deference." *Id*. This is correct as a matter of law. The Regulations exclude chiropractors from the list of "acceptable medical sources," *see* 20 C.F.R. § 404.1513(a), and instead categorizes chiropractors as "other sources," *id*. § 404.1513(d)(1); *see* Soc. Sec. R. 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Because of this, the ALJ was not required to adopt or place controlling weight on Dr. Ewing's opinions even though he had a treatment relationship with Plaintiff. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) ("the ALJ was not required to adopt the opinions of a treating chiropractor nor to give them controlling weight.").

The ALJ next discounted Dr. Ewing's opinions because "his statement went to the ultimate issue of the claimant's disability status, which is reserved to the Commissioner." (Doc. #6, *PageID* #1044). It is correct to say that the question of whether an individual is under a disability rests with the Commissioner. *See* 20 C.F.R. § 404.1527(d). But, the fact that Dr. Ewing's opinion went to this ultimate issue was not a valid reason to reject his opinions. "The pertinent regulation says that 'a statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled.' That's not the same thing as saying that such a statement is improper and therefore to be ignored...." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) (internal citation omitted); *see Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 861 (6th Cir. 2011) ("the fact that the ultimate determination of disability, *per se,* is reserved to the Commissioner, 20 C.F.R. § 404.1527(e), did not supply the ALJ with a legitimate basis to disregard the physicians' [opinions].").

11

Although the ALJ erred in this way, her analysis of Dr. Ewing's opinion continued. She next explained, "Dr. Ewing's opinion is inconsistent with the mild degenerative findings and essentially absent clinical findings of record, which demonstrate normal reflexes, sensation, and muscle function. Accordingly, even when evaluated under the requirements for other opinion evidence, Dr. Ewing's opinion is not supported by even minimal evidence…." (Doc. #6, *PageID* #1044).

These reasons for placing minimal weight on Dr. Ewing's opinions applied the correct legal criteria. Opinions from chiropractors "who are not technically deemed 'acceptable medical sources'…, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." Soc. Sec. R. 06-03p,, 2006 WL 2329939, at *3. To evaluate a chiropractor's opinions on these key issues, the factors for weighing acceptable-medical-source opinions "can be applied…." *Id*. at *6. These factors include how long the chiropractor has known the claimant and how frequently he or she has seen the claimant; the consistency of the chiropractor's opinion with other evidence; the degree the chiropractor presents relevant evidence to support his or her opinion; how well the chiropractor explains his or her opinion; the chiropractor's specialization; and "any other factors that tend to support or refute the opinion." *Id*. at *4-*5.

The ALJ applied the "consistency" and "supportability" factors to discount Dr. Ewing's opinions. Her decision therefore applied the correct legal criteria.

The Commissioner contends that substantial evidence supports the ALJ's reasons for discounting Dr. Ewing's opinions. This is correct. The ALJ accurately observed that

12

Dr. Ewing's notes recorded Plaintiff's subjective complaints (regarding limitation of range of motion, pain on palpation, etc.) and the spinal-manipulation treatment Dr. Ewing provided, but these notes failed to document clinical findings consistent with nerve root compression or impingement. *See* Doc. #5, *PageID* #s 870-964, 999-1013; Doc. #6, *PageID* #s 1278-79); *see also Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) (A physician's statement that merely regurgitates a claimant's self-described symptoms "is not a medical opinion at all.").

The ALJ also accurately found inconsistencies between Dr. Ewing's opinion and laboratory findings showing only mild degenerative changes and other clinical examinations revealing normal reflexes, sensation, and muscle function. For example, Plaintiff's MRI scans showed just "mild degenerative change[s]" or "early degenerative disc disease" but no disc herniation or stenosis. *See* Doc. #5, *PageID* #s 497, 534, 579, 601, 744 .

In the absence of objective clinical signs, a medical source is left mainly with a claimant's subjective statements. At least two physicians expressly commented that Plaintiff's complaints about his back pain appeared disproportionate to the objective findings, as the ALJ correctly recognized. After examining Plaintiff in February 2010, Amita Oza, M.D., wrote, "[t]here is no evidence of lumbar radiculopathy" and Plaintiff's "pain seems out of proportion to his physical findings." (Doc. #5, *PageID* #634). Similarly, in July 2008, a provider cogently wrote, "It was felt that during the examination that the veteran was somewhat exaggerating the pain, never showing any

facial expressions of severe pain. He was observed walking from the examining room towards the waiting room with his pace quicker and gait was almost normal." *Id.* at 593.

Plaintiff contends that the ALJ's evaluation of Dr. Ewing's opinion was deficient because she did not cite any conflicting medical source opinions. This, however, does not identify error in the ALJ's decision. The Regulations do not require ALJs to cite the medical opinions that conflict with the opinion of an "other source" in order to justify giving that opinion less weight. *See* 20 C.F.R. § 404.1527. In addition, the record actually contains two medical opinions that, although not relied upon by the ALJ, are inconsistent with Dr. Ewing's opinion. In April 2010, Esberdado Villanueva, M.D., opined that Plaintiff's back condition did not even satisfy the requirements to be considered a severe impairment, writing, "[Plaintiff's] allegations and statements do [not] appear to … be wholly credible. [Plaintiff] may experience pain but the [MRI] and xrays do not support any severe impairment…The current objective findings do not support a severe physical impairment." (Doc. #5, *PageID* #641). The record also contains a June 2007 opinion from Nick Albert, M.D., that Plaintiff was capable of performing medium-exertion work despite his back condition. *Id.* at 487-94.

Next, contrary to Plaintiff's contentions, the ALJ decision fails to indicate that she was "play[ing] doctor" by relying on her own medical opinions in place of medical source opinions or evidence of record. The ALJ's decision discusses the medical evidence concerning Plaintiff's back impairments and properly considered that evidence when weighing Dr. Ewing's opinions.

14

### B. Remaining Medical Source Opinions

Plaintiff argues that the ALJ erred by placing significant weight on examining psychologist Dr. Flexman's opinions about his mild mental-work limitations and by placing minimal, if any, weight on his treating psychiatrist Dr. Sehbi's opinion that he would be absent from work more than three times per month.

The Regulations contain a treating-source rule that potentially prefers the opinions of treating physicians or psychologists:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *see Gentry*, 741 F.3d at 723. If the treating source's opinion is not controlling, the ALJ must consider "the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician [or psychologist]; and any other relevant factors." *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544). These factors likewise apply to the opinions of non-treating medical sources. *See* 20 C.F.R. 404.1527(e); *see also* Soc. Sec. R. 96-6p, 1996 WL 374180, *2 (July 2, 1996).

The ALJ described the correct legal criteria used to weigh treating-source opinions, recognizing both the treating-source rule and the need to continue weighing treating source opinions when the treating-source rule does not apply. *See* Doc. #6,*PageID* #1044-45). The ALJ then applied the correct legal criteria to conclude that

15

Dr. Sehbi's opinions were entitled to minimal, if any, weight. *Id*. at 1045. Substantial evidence supports the ALJ's weighing of Dr. Sehbi's opinions.

Dr. Sehbi's opinions were inconsistent with her own treatment notes. In terms of social functioning, she believed opined that Plaintiff had marked restrictions, but her records generally document his cooperative attitude and, particularly after the initial treatment sessions, present no evidence of irritability, anxious mood or affect, constricted affect, or other observations that would support marked restrictions in social functioning. (Doc. #5, *PageID* #s 814, 824, 853, 859, 996). Further, the notes show that Plaintiff maintains a stable relationship with his children and no other medical source reported significant difficulty in this area. *Id*. at 637, 678-79, 995-96; Doc. #6, *PageID* #1065. Similarly, although Dr. Sehbi opined that Plaintiff had "extreme" difficulties with concentration, the ALJ discussed how no evidence of decreased concentration was ever noted by Dr. Sehbi or by Dr. Flexman and that a 2008 neuropsychological assessment revealed no cognitive impairment. *See* Doc. #6, *PageID* #1045; *see, e.g,* Doc. #5, *PageID* #s 638-39, 814, 824, 853, 859, 996. The ALJ also accurately saw that no medical source—including Dr. Sehbi—has reported Plaintiff has experienced thought-process or content abnormalities for any significant period.

Additionally, Dr. Sehbi has not recommended any inpatient treatment, nor did she request a greater treatment frequency—which would have appeared more consistent with the marked and extreme limitations she included in her opinion. And, there were other inconsistencies. Although Dr. Sebhi indicated that Plaintiff "continues to have" suicidal ideation, the record documents only one short period of suicidal ideation in mid-2011,

which quickly resolved. (Doc. #5, *PageID* #s 849-56). The ALJ also noted that despite Dr. Sehbi's opinion that Plaintiff's mental impairment was disabling, she believed he had only slight limitations in activities of daily living. *Id*. at 867.

With respect to Dr. Sehbi's opinion that Plaintiff would miss several days of work per month due to treatment or symptoms, the ALJ properly gave it less weight because it was, "at best, speculative and primarily based on [Plaintiff's] subjective allegations." (Doc. #6, 1046; *see* Doc. #5, *PageID* #867). *Cf. Wagers v. Comm'r of Soc. Sec.*, No. 1:15-CV-312, 2016 WL 4211811, at *7 (S.D. Ohio 2016) (Bowman, M.J.) ("The ALJ analyzed minute portions of the treating physicians' RFC opinions in unusual depth, and should not be penalized for failing to discuss her reasons for rejecting one discrete portion that offered a wholly speculative and unsupported and vague "estimate" that Plaintiff would be absent from work more than 3-4 days per month"), report and recommendation adopted, 2016 WL 4194504 (S.D. Ohio Aug. 9, 2016) (Dlott, D.J.)

Turning to Dr. Flexman, the ALJ applied the correct legal criteria to Dr. Flexman's opinions by recognizing that he examined Plaintiff, provided conclusions consistent with the mild findings from his examination, and identified mental-status findings generally consistent with the mental-status findings provided by other medical sources, including Dr. Sehbi. Substantial evidence supports the ALJ's reasons for placing significant weight on Dr. Flexman's opinions. Dr. Flexman did exam Plaintiff. Doing so, he obtained information from Plaintiff about his family, health, and educational and work histories. Dr. Flexman also made clinical observations, asked psychological test questions, gathered information about his daily activities, and assessed his mental

17

status, flow of conversation and thought, affect and mood, anxiety, mental content, bodily concerns, sensorium and cognitive functioning, and insight and judgment. In his report, Dr. Flexman noted that Plaintiff "is able to handle all activities of daily living on his own," "[w]hen [Plaintiff] needs to go someplace he gets a ride or drives himself," and "[h]e or a family member prepares his food throughout the day." (Doc. #5, *PageID* #637). He noted that Plaintiff's activities included going to parks, sports activities, children's activities, going to the movies, and going out to eat. Plaintiff told Dr. Flexman that he visited and talked with his friends, visited and talked with his children, babysat his own children, talked on the phone with friends and family, read the newspaper, and handled his own finances. Although the psychologist described Plaintiff's "[e]ffort []as poor" on a memory test, Plaintiff was still able to recall 3 of 3 items after five minutes and 3 of 3 items after 15 minutes. *Id*. at 638. Such substantial evidence supports the ALJ's weighing of Dr. Flexman's opinions.

It should lastly be noted that the Commissioner addresses the ALJ's review of the VA's disability determination. Plaintiff, however, has not provided any analysis of a purported error in the ALJ's decision regarding her consideration of the VA's disability determination. Plaintiff's Reply memorandum contains no discussion of the portion of the ALJ's decision that considers the VA's disability determination. Consequently, there is no need to delve into the details of the Commissioner's unrebutted VA-related arguments.

Accordingly, Plaintiff's Statement of Errors lacks merit.

## IT IS THEREFORE ORDERED THAT:

1. The ALJ's non-disability decision is affirmed; and

2. The case is terminated on the Court's docket.


September 29, 2017                         *s/Sharon L. Ovington*
                                           Sharon L. Ovington
                                           United States Magistrate Judge